## GUARDIAN TRUST CO. et al. v. DOWNINGTOWN MFG. CO.

District Court, E. D. Pennsylvania.    April 17, 1928.

### No. 3441.

1. Patents ⬀328—Millspaugh, 1,205,822, for improvement in paper-making machines, claims 2 and 3, held valid and infringed.

Millspaugh patent, No. 1,205,822, for an improvement in paper-making machines, known as the "Millspaugh roll," claims 2, 3 and 5, *held* valid, and claims 2 and 3 infringed.

2. Patents ⬀36(1)—Common judgment of those skilled in the art that invention is present in patented device cannot be ignored.

No court will follow its judgment to deny invention, in face of the common judgment of those skilled in the art, and who are selfishly interested to deny it, if it does not exist, that invention is present.

In Equity. Suit by the Guardian Trust Company and the Paper & Textile Machinery Company against the Downingtown Manufacturing Company. Decree for complainants.

Osgood H. Dowell, of Chicago, Ill., and Henry N. Paul, Jr., and Henry N. Paul, both of Philadelphia, Pa., for plaintiff.

Charles H. Howson, of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. The art with which this cause concerns itself is one of the oldest and one of the most important. The history of its development is most interesting. The conduct of the trial by counsel and experts has been in keeping with the dignity and importance of the subject. Knowledge has been lavish of "her ample store," and all the resources of science and experience have been placed at the service of the court. We would not wish to be thought unappreciative of the richness of the offerings made, nor would we like to feel that all this enlightening labor had been wholly wasted. As we view it, however, the decision of the cause turns upon two doctrines of the law, or rather which of them is applicable.

The plaintiff plants the assertion of its claim of right upon letters patent No. 1,-205,822, issued May 12, 1912, to William H. Millspaugh, for improvement in paper-making machines. The answer presents the usual defenses, which may be condensed into validity and denial of infringement.

### Invention.

[1] Plaintiff's cause of action rests upon its claim to the exclusive right to make, use, and vend an improvement or adjunct to a Fourdrinier paper-making machine. This goes by the name of a Millspaugh roll. Is the Millspaugh roll an invention, within the meaning of the patent laws? The patent laws do not primarily define a right given, although they necessarily give such a definition. Primarily they declare and announce a policy. That policy is very happily and adequately expressed in the phrase employed in the grant of the power to Congress to legislate on the subject. There are thus two overlapping thoughts in the idea of a patent law "invention." There must have been something "invented" and that something must merit the reward of a patent, by bringing into the art a new possession by which its progress is promoted by making the art that much richer. The verbiage with which we have been supplied, which comes the nearest to conveying these combined ideas or the combination idea, is found in the words "novelty and utility." The thought is an old one, and universally accepted, so as to give it the character of triteness, that all the elements which enter into a combination may have in themselves no novelty, and the aggregation of them have no utility, and yet the combination may have striking novelty and great utility.

The invention here resides wholly in the combination. Its presence is due, not to the elements or in the bringing of them together, but in their co-ordination. This is clear enough, but there is suggested in its statement another distinction, the thought of which is with more difficulty expressed. It is conceivable that there may be elements in combination and a resulting utility, and yet be much left to be desired. There may enter into the combination one or more machines, with room for the application of skill in their operation. One may take this old combination, and by the use of a better constructed machine or by greater skill in operation, produce an improved result. Here there may be nothing new, either in means or results, but merely in the degree of utility, and no invention, because there is nothing new in construction or in the principle of operation. The difference is wholly that between a little elephant and a big one.

There may, however, be so great a difference in results in degrees of utility that the results may be said to be not merely a difference in degrees of results, but in results. This is a difference, not between a little man and a big one, but the difference between a Lilliputian and a Brobdingnagian. A test or evidence of the existence of the difference we have attempted to outline may be found in the recognition afforded by general public acceptance. No one may be able to point out any marks of distinction between two things, other than in the degree of excellence of results or otherwise; yet if the difference be great, unusual, and striking, and that part of the public which is concerned accepts and proclaims the results as not merely better, but as new, this common public judgment will be accepted as evidence of invention, and from this evidence of invention it will be found. No citation of authorities is needed to support this statement.

Great knowledge and exhaustless ingenuity have been displayed in the effort to show that underlying the Millspaugh roll there is (in addition to improved results) the application of a new, in the sense of a different, principle from that before employed in the art.

There is a difference between thinking you have a thought within your grasp and having it. The practical test of whether you have it is to attempt to convey it to another mind. If you cannot put another in possession of a thought, your failure is strong evidence against your own possession of it. Some thoughts, or what you think are thoughts, have a peculiarly elusive quality. No matter how clearly you may think you have them formulated in your own mind, the moment you attempt to give them expression they slip from your grasp. Very often this is due to a change in the angle of view. The subject has the characteristic of some ingeniously constructed advertising signs. Looked at from one angle, you see clearly one message; change very slightly the angle of view, and you see just as clearly another.

Again, there are subjects of thought which, viewed in the mass and as general propositions, seem to be clearly and indeed sharply defined, but when viewed in the concrete and particular elude us and vanish. This is very much the difficulty which confronted this patentee when he came to express his inventive concept in the words of a claim. If a cloth is saturated with water, and the problem is presented of getting rid of the moisture, the differences in the principles of operation of different methods which may be employed are readily seen. The cloth may be simply exposed to the atmosphere and the water evaporated. The wet cloth may be run between rolls or wringers, and the water expressed or squeezed out. The cloth may be subjected to a large current of air of high velocity, and the water blown or blasted or carried out by and with the air which passes through the interstices in the cloth. No mind would be slow to recognize that here were three different methods, nor would the thought of difference be blurred by the truth that there was some evaporation, some squeezing, and some passage of air through the cloth in each instance. Nor would any one deny invention to the introduction of any one of these methods, if before unknown and the result improved. If, however, the wet cloth were placed over a pan or other cavity, and the water removed by the creation of a vacuum in the cavity, one would ask for further light before finding that the water was squeezed out when A employed this method, but blasted out when B employed it.

The paradox embraced in this proposition presents the opposing contentions of the parties in one aspect of this case. The cause is, we assume, of importance because of the money results following its ruling. We know it has been a hard-fought one. An attending circumstance, and perhaps consequence, has been that neither side feel it to be safe to accept any proposition of fact or law advanced by the other. We venture, however, upon the statement of some facts (in themselves of no controversial value), in order to bring out the force of the opposing arguments addressed to us.

For our purposes the making of paper may be said to begin with the vegetable particles or fibers of which paper is composed, held suspended in water which is carried along by a conveyor in the form of a stream, but is not a flowing stream. This mixture is nearly all water described in terms of proportionate bulk. One problem is to get rid of the water. This is done gradually, in successive and progressive stages. Skipping the earlier of these stages, the practice during the prior art period was and still is to make use of what may be called a wire screen conveyor. This passed over "flat boxes," which for our purposes may be described as pans, from which the air was pumped, thereby creating a vacuum to serve as an aid in getting rid of the water. The material which finally becomes paper then passes on in its travels to what are called (although the parties are not in accord upon even pronunciation) Couch rolls. There were two of these; one above the other.

There comes, of course, a time when the product takes the designation of "paper." It is further, of course, yet far from being finished paper, but may nevertheless be called by that name. Just when this designation becomes proper the parties are out of accord, but we will assume that the name "paper" may be used at the stage at which the Millspaugh roll comes into use. We say this because this is at the old Couch roll stage, at which the product is by an ingenious method transferred from the wire conveyor to what we will call a felt, or wet felt, conveyor. The product at this point must have a degree of strength sufficient to enable it unsupported to pass from one conveyor to the other, there being an open space between them.

There is at least one other feature of the situation which confronted the prior art, which we should have in mind. That feature is the rate of travel of the product in course of manufacture. It would be evident, even to one unfamiliar with the art, that methods, processes, and instrumentalities which would answer well to one rate of speed of production (which means the speed of the conveyors) might well be short in perform-

ance when the speed was increased. The paper must have the strength to sustain itself while being carried across the gap of which we have spoken. Enough water must have been removed from the pulp to give this required strength. The suggested thing to do was to create a higher vacuum within the flat boxes. Here, however, a limitation was encountered. If the pull or pressure upon the sheet as it passed over the flat boxes was made too strong, the wire screen would "lock." Hence it became a teaching, and a fixed idea of the prior art, that the vacuum created in the flat boxes must be relatively low, so that no highly efficient pump was needed.

The art had advanced to the thought that a more effective withdrawal of water could be secured by introducing the vacuum chamber to the Couch roll, thus doing away with one of them, and of some of the flat boxes; but the thought still persisted that the water must be removed on the flat box principle, and this made necessary (as was indeed true) that the vacuum be kept low. This latter difficulty the art was taught to overcome by Millspaugh himself through the introduction of a set screw device (the subject of an expired prior patent) by means of which the vacuum could be kept down as desired. The art, however, still clung to the flat box principle, and because of this continued to make use of reciprocating pumps. A consequence was this: The withdrawing action of the vacuum (whether at the flat boxes or in the roll) operated on the sheet as it was moving. With the use of a reciprocating pump, for a reason which we need not take the time to state, the result upon the paper was alternate spaces relatively one wet and the other dry. The net result was unsatisfactory, especially at the high speed of sheet which was then in demand. Such was the state of the art when the application for the patent in suit was filed.

We have made no reference to what is known to this record as the Curtis prior use in this summary of the possessions of the prior art. This is for the reason that we see nothing in the Curtis use beyond the practice in other paper mills, so far as it affects the fact situation out of which the question of invention arises. They were all doing what Curtis did; the only difference being in the pump which each happened to be using and the speed reached. That what Curtis was doing was not what the Millspaugh patent taught should be done is evidenced by the fact that the Millspaugh roll was installed in the Curtis mill with the same immediate results as followed its introduction into other mills.

The explanation (although apparently a mistaken one) clearly given by the witness White of the failure of the Black (English) patented roll will well serve the purposes of an illustration of the thought we are attempting to develop. White thought that the Black patent disclosed everything which the Millspaugh roll (the patent before us) possesses, except the kind of pump to be used. His idea was that the Black roll failed because Black adhered, in accordance with the teaching of the art, to the use of a reciprocating pump. Asked why a more efficient pump was not used, the witness answered in effect that it never occurred to any one then that the efficiency of the pump had any relation to the failure, and when asked whether, if a better pump had been installed, the Black roll would have proved a success, his answer was an emphatic affirmative. There seems to be accord in the opinion that he was wrong because, had a higher vacuum pump been installed, Black would have encountered the "locking" difficulty. Millspaugh, as before stated, later removed this, so that, with this "locking" trouble removed, his answer holds good.

Millspaugh himself supplies us with another illustration of the prior art situation. Paper-making machines cost $100,000 or more to install. After he had perfected the thought of his now claimed invention, he could give it a practical test only by persuading some paper maker to try it out. All of them had seen so many efforts to employ the Couch roll vacuum idea end in failure that they had passed from the Missouri attitude of mind to one of fixed disbelief in the idea itself. As a consequence, one after another to whom he made application refused his request for a trial, even although he agreed to pay them for the time and the profits lost, if the production decreased. Finally, when he did get the consent of one paper maker, it was qualified with the condition that the Millspaugh roll should be operated with the pump then in use. Millspaugh consented upon the promise that, if the test was a failure (as he predicted it would be), he might install the pump for which his patent called. The trial with the old pump proved a failure, but that with the rotary pump an immediate success.

From this testimony and evidence the respondent draws what would seem to be the justified inference that the only advance made, shown by the claimed invention, was in the use of a more efficient pump. This lays the ground for the argument that the ef-

ficiency of an air pump is in the "high" or "heavy" or completeness of the vacuum it will produce, and that the thought of this was an obvious one, not reaching the dignity of invention. There had been, it is true, the before-mentioned obstacle or objection to the use of a high vacuum pump in the danger of the locking of the wire; but this obstacle had, as before stated, been removed by Millspaugh himself through the disclosures of his prior patent, so that there was nothing left to be disclosed by the instant patent.

This argument conducts us to the conclusion of no invention. As we understand the reply to this argument, it is one in confession and avoidance. The argument is asserted to be built on the underlying thought (and this we think to be true) that the Millspaugh patent in suit calls for a high vacuum. Issue is taken with the defendants right there. All former attempts to solve the problem had been upon the use of the flat box vacuum principle. It is admitted that resort merely to a higher vacuum would not warrant a finding of invention. What is claimed for Millspaugh, however, is not a better roll than the prior art supplied, but a complete bouleversement in the principle of operation. The old principle was what we have designated as the squeezing operation effect. Millspaugh abandoned this, and resorted to a roll constructed on the wholly different principle of operating upon what we have called the blasting effect principle. To get the former, a high vacuum was called for; to get the latter, a high vacuum was not needed, but what was necessary was a great volume of air moving at a high velocity, with an even, constant, continuous flow. The result sought in response to the teaching of the old art was to have as much atmospheric pressure as could be applied without locking the wire. This pressure was that of the superincumbent air upon the sheet; none or very little of which passed through the sheet.

The teaching of the Millspaugh patent is radically different. Here this pressure upon the sheet was of minor or no importance. The desideratum was to induce the flow of as large a volume of air, moving in an even, continuous flow, with as great velocity as could be induced, through the paper. It is true that the force applied is in a real sense the same, and is induced in each case by the creation of a vacuum. The real difference, however, is not how the force is supplied, but where it is applied. What we may call the raw material of paper manufacture is, in what we have called the first stage, composed largely and in percentage almost wholly of water. This

is evidenced, not merely by an analysis, but by its physical appearance. Up to a point in its travels some distance beyond the Dandy roll, it is a sheet of water observable by the eye. Here the difference between the two principles is clear. Atmospheric pressure applied above a flat box so located will, of course, force out water; but any attempt to force air through the material under such conditions is to essay the fruitless effort to force air through water. The higher the vacuum maintained in the flat box, the greater the pressure; but no more air (in the sense under consideration) goes through the material. By the time the material has traveled to the Couch roll, however, it is relatively dry enough to be porous, so that air may with some freedom be forced, not merely upon the material, but through it, and, if the rate of speed of its passage is high enough, will expel water by carrying it with or forcing it out ahead of the air.

This brings out clearly the thought of expulsion of water, produced not by great pressure upon its surface (due to a high vacuum), but to a great current of air (however induced) moving with a high velocity and an even continuous flow. Whether this distinction has any basis in fact, or is a mere theory with no fact basis for its support, is a question over which the opposing experts have waged a battle royal. We could give a readier acceptance to this claim to invention, were it not for the fact finding which we make that the thought of placing a vacuum chamber in the Couch roll position was old. The claim to invention on this ground is thus reduced to the thought of bringing into an otherwise old combination a more effective pump than that employed in the prior art. The followers of the old art, however, could not be persuaded, until the performances of the Millspaugh roll convinced them, that there was any merit in the substitution of one pump for another.

This fact, merging as it does into another, is, as we view it, the only claim to invention (aside from the prima facie effect of the letters patent) which this record discloses. It is none the less to our mind controlling, except so far as the thought expressed on the subject of infringement limits the scope of the claims of the patent. The fact referred to is the immediate effect, upon those concerned in the art, of the performances of the Millspaugh roll. A real want had been felt, and the shortcomings of the prior art experienced. Many efforts had been made to fill this long-felt need, but all of them had ended in such demonstrated and pitiable failures

that the art had accepted the settled conviction that it must get along as best it could with what the art had supplied.

[2] As soon as the Millspaugh roll was given a test, the trade recognized the results to be a demonstration of its value, and accepted it as the fulfillment of its needs. The benefits which it conferred upon the trade were so great and unusual, coupled with the recognition of its merits with which its advent was heralded, as to supply evidence of invention which we cannot ignore. The doctrine of the law upon which the finding of validity is based comes to this: That no court will follow its judgment to deny invention in face of the common judgment that invention is present, when the common judgment is of those skilled in the art, and who are selfishly interested to deny it, if it does not exist. Validity is accordingly found within the scope of the claims as hereinafter defined.

### Infringement.

When an invention is made, the thing patented must be so far defined in the claims of the patent issued as that the limits of the right granted may be known, and users warned of what it is upon which they may not infringe. All the elements in this combination are old, and the only novelty in the combination itself is the inclusion of the feature which may be described or found to be known to those skilled in the art as a "positive rotary pump." The file wrapper discloses the limitation of the scope of the claims of the patent which we will endeavor to express. What was patented was a thing made up of a combination of things, one of which is a pump. To express the thought of what the patentee could alone use, or, what is the same thing, what others could not lawfully use, words must be employed. These words ordinarily might be words of description, or they might be words of designation, or mere names or labels, or they might be the former, but applied as the latter.

The applicant sought first to use words of description. These claims were rejected, because the effect of them was to give to the patentee the sweeping claim to a combination which might be read to include any pump which would produce the desired result. How impossible the allowance of such claims was is made clear by an illustration: The developments of many of the arts alike called for an improvement in the methods of producing high vacua, or what the defendants assert (we think with truth) to be the same thing—improved, because more efficient, pumps. The pumps of to-day can accomplish in a given time what would have taken 500 times as long to do with pumps of a past period barely longer than the life of the patent in suit. The statement that a pump of to-day is 500 times as efficient as the best pump of 1903 sounds extravagant, and would be thought to be an exaggeration. We hasten to justify and to support it by the further statement that what we have said is a paraphrase, and almost a literal verbal quotation, from a publication vouched for by the Journal of the Franklin Institute. The statement, of course, was not made of pumps used in paper making, but it was of pumps used to produce a vacuum, and serves us the purpose of an illustration.

The allowance of the claims of the original application would have prohibited the use by this art of vastly improved pumps unless tribute was paid to this plaintiff for the use of pumps which others had designed. These broad claims having been rejected, the applicant, in order to get a patent, resorted to the words "positive rotary pump," which we select as representative of the different words used in the different claims. These words must be interpreted as nominative, or as a name or label, because, if interpreted as words of description, we would be bound to give them a range of equivalency which would accord to the patentee what the Patent Office refused to grant him. Any one is in consequence permitted to use with a Couch roll any combination of any things, except that one of them may not be a pump known to those skilled in the art by the name or designation of "a positive rotary pump." The defendants have made use of two installations, each of which is charged to be an infringement. The question then becomes whether the pump used in both, or either, is known to those who know pumps, and the names by which they are known, as "a positive rotary pump." This is a question of fact.

One of the two claimed infringing uses is that known to this record as the St. Regis. There is a regrettable, but unavoidable, possible consequence to pump makers in the conclusion we have reached. We therefore confine ourselves to the finding that the St. Regis installation is an infringement of the Millspaugh patent, but the other is not.

Perhaps a word should be added by way of a statement of our reasons for making the differentiation we have made in our finding of infringement. As we view it, the controlling question here is, not what is a positive pump in mode of operation, or in results, but what is known to those skilled in the art by the name of a "positive rotary pump."

The whole difficulty here is in the fact that the words of designation employed are likewise words of common speech, and hence, also words of description. We may make another draft on this record for an illustration of the distinction. Two persons figure in it. One bears the name of Black; the other that of White. Black was the patentee in a patent which is in evidence. White was a witness. Assume the Black invention to be called a Black invention, and a controversy between them over its ownership turning upon the question of the identity of the patentee: The strength of Black's claim to ownership would not be lessened by evidence that he was white, nor would White's claim be strengthened by proof that he was black. We may still further appeal to a trite and overworked illustration. There is a substance or material known as "German silver." If the question arose whether another material was "German silver," the answer to the question could not be extracted from evidence that the first was neither silver nor German, nor that the latter was silver and was of German origin or otherwise. It is admitted that the St. Regis type of pump is one known as a "positive rotary pump." There is evidence that the other pump answers in construction, in mode of operation, and in results to the descriptive words "positive rotary" as words of common speech. Our finding, however, is that it is not a pump known by that name.

A decree finding the validity of claims 2, 3, and 5 (being those in issue), with the stated limitation of their scope, and finding infringement by the St. Regis installation of claims 2 and 3, may be submitted.